the execution was issued is against the said corporation upon its promissory note. It is, legally speaking, but an accident that the plaintiffs in the latter action are the owners of the corporate stock of the defendant and are of its directors. As such plaintiffs and as such directors they are distinct entities. The order does not reach them in their status as judgment creditors in the note action, for it but runs against the defendant corporation, and the expression its "officers, directors, agents, and attorneys" is not essential, and is but in amplification, inasmuch as a corporation acts through such instrumentalities.

[2-4] If the injunction order were interpreted to restrain the plaintiffs in the judgment upon the note from enforcing that judgment to the utmost, then it would not be right; for in effect the court in one action would restrain strangers thereto from enforcing their remedy under their separate action, which is wholly unrelated to the action wherein the order was made. The rule is well expressed by McLaughlin, J., speaking for the unanimous court in Grammer v. Greenbaum, 146 App. Div. 3, 4, 130 N. Y. Supp. 569, 570:

"The power of the court to stay proceedings or control the trial of an action is one which must be exercised in the action itself (Raymore Realty Co. v. Pfotenhauer-Nesbit Co., 139 App. Div. 126 [123 N. Y. Supp. 875]; North Central Realty Co. v. Blackman, 145 App. Div. 199 [129 N. Y. Supp. 1005]); and where it is sought to enjoin parties from proceeding in another action, such relief must be by injunction in an action where such relief is demanded in the complaint (Belasco Co. v. Klaw, 98 App. Div. 74 [90 N. Y. Supp. 593]; Webster v. Columbia National Life Ins. Co., 131 App. Div. 837 [116 N. Y. Supp. 404], affirmed 196 N. Y. 523 [89 N. E. 1114])."

If the plaintiffs proceed to enforce the execution of the judgment by sale, the defendant does not sell or take any action tending towards a sale; as to it the sale is in invitum.

The order is affirmed, with $10 costs and disbursements. All concur.

---

(77 Misc. Rep. 646.)

### PERRY v. HUDSON & M. R. CO.

(Supreme Court, Special Term, New York County. September, 1912.)

NEW TRIAL (§ 105*)—NEWLY DISCOVERED EVIDENCE.
　　Where, in an action for personal injuries, a physician, who examined plaintiff, testified as an expert that he had made a blood count to ascertain the condition called anæmia, which he claimed to have discovered in plaintiff, and on a trial by the husband against the same defendant for the same injury denied to have made a blood count, judgment for the wife will be vacated, and a new trial for newly discovered evidence will be granted.

　　[Ed. Note.—For other cases, see New Trial, Cent. Dig. §§ 183, 221–223, 229; Dec. Dig. § 105.*]

Action by Mary Perry against the Hudson & Manhattan Railroad Company. Judgment for plaintiff. Motion to vacate judgment and for a new trial for newly discovered evidence. Granted.

E. J. Flanagan, of Brooklyn, for plaintiff.
Bertrand L. Pettigrew, of New York City, for defendant.

DELANY, J. This is a motion to vacate a judgment and for a new trial on the ground of newly discovered evidence. The action was brought to recover damages for personal injuries alleged to have been sustained by the plaintiff by the falling of an elevator in the building where she was engaged at her work as scrub woman. The evidence which defendant claims is newly discovered consists of statements, made under oath, by a physician, on the trial of the case of the husband of the plaintiff against the same defendant for the injuries sustained by her, contradictory of his testimony on this trial. Plaintiff, on her own behalf, testified, in a rather vague way, to various pains and aches, and claimed that, so far as she knew, before the accident she was in good health, never having any illness except trivial and periodical headache, accountable without attributing it to any constitutional weakness or defect. The physician who treated her for the injuries alleged to have resulted from this accident was not produced; but Dr. Robert L. Graham, who qualified as an expert, examined her shortly before the trial for the purpose of testifying thereat. The particular phase of his testimony which forms the basis of this motion embraces a condition which he claims to have discovered in the plaintiff, and which he characterizes as progressive anæmia, and the method employed by him in making his diagnosis. He testified that he made a blood count—the only scientific method for ascertaining incontestably the condition called anæmia. On the second trial he denied ever having made a blood count. The defendant claims that this testimony on the plaintiff's action must have impressed the jury, and was undoubtedly causative of the amount of the verdict—$7,000—independent of the testimony as to other injuries. The testimony of Dr. Graham on this point on the trial of the case of the plaintiff herein was as follows:

"*The blood test* showed this woman to be anæmic, *the blood count* showing the proportion of blood vessels of red blood corpuscles much less than normal in comparison with the number of white corpuscles; in other words, this woman was anæmic. The heart symptoms showed a condition of prostration. Both heart sounds were subnormal. Those were the physical evidences. I mean by prostration in this case that this woman has suffered a condition of nerve excitement which is now followed by a condition of exhaustion. I mean, when I say this woman is anæmic, that the blood has undergone a degenerative change, or become diseased, due to the improper blood changes itself and the improper production of blood through the usual channels. Q. But so far as this anæmic condition was concerned, you would have to take her statements if it did exist? A. I did not. *I took a sample of the blood.* Q. And that condition has a tendency to cause a run-down condition, hasn't it? A. It is questionable which is the cause and which is the result; but the two conditions must accompany each other."

The testimony of the same physician on the trial of the husband's case was as follows:

"*I did not make a blood count* in this case. Q. You made no blood count in this case? A. I did not. Q. In other words, you took it for granted that she had anæmia? A. I did not take it for granted. I took the usual methods of ascertaining; but *I did not take the extraordinary method of taking a blood count.*"

It is needless to say that this is a glaring contradiction between Dr. Graham's testimony in the first case and the second. The motive of

the witness need not be considered here. The question is: Is it not to be presumed that his testimony was a material factor in the verdict, or, at least, in its amount; and can it be safely said that it had no substantial bearing on the finding of the jury? Unless that can be answered in the negative, it seems to me that the ends of justice can only be served by vacating the judgment and ordering a new trial. It is urged that some of the statements are due to the mistake of the reporting stenographer; but that is not tenable to any substantial extent, in view of the nature of the testimony and the conditions under which it was given, and it is taken from the case as both parties have proposed it, and as it has been settled by the trial justice for appeal. The testimony was elicited in a succession of running questions, not leading in character. It was not suggested, but given by the witness in an expository manner, much as if by a lecturer. It may be gleaned from the case, and well-informed lay people generally know, that anæmia does not always give signs; nor are its symptoms so distinctive that the plaintiff's testimony could establish it by statements of a general malaise. It is a serious, and, as a progressive disease, a very serious, affliction, and can only be determined incontestably by a blood count. Some of the jury may not have understood the exact nature of this physical derangement; but we may not suppose that their want of knowledge diminished their appreciation of its gravity, or that the blood count, stated to have shown the degenerated condition of the blod, did not, beyond question, prove to their satisfaction a "condition of anæmia and prostration or invalidism which will be progressive." They were justified in believing this if they believed the witness. All the external signs make it appear that they did believe him. Was the verdict given, then, because of his testimony, or was the verdict which would have been given augmented because of it? May we not reasonably conclude the latter proposition, at least, capable of an affirmative answer? The contention that defendant was guilty of laches in moving has nothing to support it; and neither from the pleadings nor the bill of particulars could the defendant reasonably have anticipated this evidence, and have been prepared to meet and controvert it. In view of this testimony, therefore, I deem it in the interest of justice to vacate the judgment and direct a new trial.

Motion granted, with costs to abide the event.